UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DANIEL W. ISENBARGER<br>7543 Spring Lake Drive, Apt. D1<br>Bethesda, MD 20817,<br><br>        *Petitioner,*<br><br>    v.<br><br>Major General<br>KENNETH L. FARMER JR.<br>Commander<br>Walter Reed Army Medical Center<br>6900 Georgia Ave., N.W.<br>Washington, DC 20307,<br><br>        *Respondent.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. |

## APPLICATION FOR WRIT OF HABEAS CORPUS

### Jurisdiction

1.    The Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 2241; the due process clause of the Fifth Amendment; 10 U.S.C. §§ 2005, 2120 *et seq.*; Department of Defense (DoD) directives [Directive 6000.2, "Minimum Terms of Service and Active Duty Obligations for Health Service Officers" (March 19, 1981) (and subsequent iterations)]; and active duty service agreements between petitioner and the Secretary of the Army.

2.    This is an action for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

## Venue

3.    Venue is proper because petitioner, as explained more fully below, is in custody in this District for habeas corpus purposes.

## Parties

4.    Petitioner is a United States citizen who resides at the address stated in the caption. He is a lieutenant colonel in the United States Army, and is assigned as a medical officer in Interventional Cardiology at Walter Reed Army Medical Center (WRAMC), Washington, DC. He is currently deployed to Iraq in support of Operation Iraqi Freedom.

5.    Respondent is commander of the installation to which petitioner is assigned. The installation is located at the address stated in the caption, and is within this District.

## Statutory and Contractual Framework

6.    10 U.S.C. § 2005(a) provides that the Secretary concerned "may require, as a condition to the Secretary providing advanced education assistance to any person, that such person enter into a written agreement with the Secretary..."

7.    10 U.S.C. § 2005(b) provides that the Secretary "shall determine the period of active duty to be served by any person for advanced education assistance to be provided such person by an armed force, except that if the period of active duty required to be served is specified under another provision of law with respect to the advanced education assistance to be provided, the period specified in the agreement

2

referred to in subsection (a) shall be the same as the period specified in such other provision of law."

8.    The written active duty agreement at issue provides that petitioner shall incur an Active Duty Service Obligation (ADSO) in exchange for Graduate Medical Education (GME).

Facts

9.    On July 15, 1986, petitioner signed a Health Professions Scholarship Program (HPSP) contract to attend medical school at Yale University. Ex. 1. In exchange for tuition and educational expenses, he incurred a four-year ADSO.

10.    At the time he signed the HPSP contract, the March 19, 1981 version of DoD Directive 6000.2, "Minimum Terms of Service and Active Duty Obligations for Health Service Officers," was in effect.

11.    On April 8, 1988, DoD revised the directive. In doing so, it increased the ADSO for time spent in military-sponsored GME programs, but only for those officers who signed an HPSP contract *after* the revised directive's effective date. The directive expressly provided that it shall not be applied to change an ADSO or active duty agreement entered into in writing before April 8, 1988. *See* DoD Directive 6000.2 (April 8, 1988), ¶ G.

12.    In September 1988, Colonel Joseph E. Salko, Director, Manpower, Personnel and Training, requested a legal opinion from the DoD Office of General Counsel concerning the revised directive's retroactive effect, if any, on service obligations.

13.    On October 20, 1988, the Office of General Counsel responded with a written opinion and, in essence, concluded that the modification of a directive does not provide a sufficient legal basis to alter active duty obligations previously agreed to by the parties to a service agreement.

14.    In May 1991, petitioner graduated from medical school and entered on active duty. He served his first tour—from 1991 to 1994—as a resident in internal medicine at WRAMC.

15.    From 1994 to 1996, he served a two-year utilization tour as a staff officer in internal medicine at William Beaumont Army Medical Center at Fort Bliss, Texas.

16.    On January 6, 1996, the Army selected petitioner for a three-year residency/fellowship training in infectious disease at Brooke Army Medical Center, Fort Sam Houston, Texas. The Army's proposed GME agreement correctly stated that his ADSO, at the time, would expire on June 30, 1998. The contract distinguished between officers who entered HPSP contracts before April 8, 1988 and those who entered thereafter for purposes of calculating GME service obligations. The Army correctly applied the pre-1988 rules to calculate the ADSO he would have incurred had he accepted the offer. In particular, the agreement indicated that he would have incurred a two-year ADSO in exchange for this three-year GME in a military facility. Ex. 2 at ¶ 6.

17.    Petitioner declined the offer.

4

18.    From 1996 to 2001, petitioner served as a staff medical investigator at Walter Reed Army Institute of Research (WRAIR), including a two-year assignment at its satellite laboratory in Bangkok, Thailand. In 1998, during this tour, he completed his initial four-year ADSO.

19.    In January 2001, after serving three years as a non-obligated officer, the Army selected petitioner for a three-year GME fellowship in cardiology at WRAMC. Ex. 3. The contract consists of two documents: the agreement and the ADSO memorandum.[1] Both documents appear on official Army letterhead. The ADSO memorandum is signed by Colonel Larry K. Hammerbacher, GS, Chief, Health Services Division, U.S. Total Army Personnel Command, Alexandria, Virginia. It states, in pertinent part, that:

> Your training program is scheduled to begin on July 01, 2001 and end on June 30, 2004. Should you accept this training, your new ADSO upon successful completion, will end on June 30, 2006. This new ADSO calculation was based upon your current Army GME selection and your previous obligations. If any facet of your selected program changes or you fail to complete the program, your ADSO may require recalculation.
>
> Please acknowledge receipt of this correspondence and indicate your acceptance of your adjusted ADSO by initialing in the space provided and return to Commander, U.S. Total Army Personnel Command . . .

*Id.* (emphasis in original).

20.    The Army, again, correctly applied the 1981 version of DoD Directive 6000.2 to calculate the ADSO that petitioner would incur under this contract. In

---

[1] There was no need for this memorandum under the earlier version of the Army's GME agreements, *e.g.*, Ex. 2, because the ADSO was stated within the text of the document.

particular, the ADSO memorandum indicated that, if he were to accept the Army's offer, he would incur a two-year ADSO for this three-year training program in a military facility.

21.    On  June  16,  2001,  having  reasonably  relied  on  Colonel Hammerbacher's representations, petitioner signed the contract and ADSO memorandum to "acknowledge acceptance of [his] new additional training obligation and new adjusted ADSO of **June 30, 2006.**" *Id.* (emphasis in original).

22.    On January 12, 2004, the Army selected petitioner for a one-year partially-funded GME training in interventional cardiology at Johns Hopkins University School of Medicine, in Baltimore. Ex. 4. The GME contract, like the prior one, distinguished between pre- and post-1988 HPSP contracts for purposes of calculating GME service obligations. The ADSO memorandum was signed by Colonel Felipe Casso, GS, Chief, Health Services Division, and specified that:

> Your training program is scheduled to begin on July 1, 2004 and end on June 30, 2005. Should you accept this training, your new ADSO upon successful completion, will end on **June 30, 2007.** This new ADSO calculation was based upon your current Army GME selection and your previous obligations. If any facet of your selected program changes or you fail to complete the program, your ADSO may require recalculation.
>
> Please acknowledge receipt of this correspondence and indicate your acceptance of your adjusted ADSO by initialing in the space provided and return to [the HRC].

*Id.* (emphasis in original).

23.    For the third time in a row, the Army applied the 1981 version of DoD Directive 6000.2 to calculate the ADSO petitioner would incur under a GME

program. The ADSO memorandum indicated that he would incur a one-year ADSO for this one-year training program in a military facility.

24.    On June 15, 2004, again having reasonably relied on the Army's representations, petitioner signed the contract and ADSO memorandum to "acknowledge acceptance of [his] new additional training obligation and new adjusted ADSO of **June 30, 2007**." *Id.* (emphasis in original).

25.    In January 2006, with the understanding that his ADSO expires on June 30, 2007, petitioner volunteered for a five-month tour in Iraq. He deployed on or about May 7, 2006 and is scheduled to return on or about October 17, 2006.

26.    On or about March 9, 2006, Major Terry G. Owens, Chief, Personnel Services Branch (PSB), Human Resources Command, Alexandria, Virginia, sent a memorandum to petitioner indicating that the Army had miscalculated his GME ADSO and was extending it by three years, despite the signed agreement to the contrary. Ex. 5. In particular, Major Owens stated:

> A review of your active duty service obligation (ADSO) for training was conducted by this office. This review indicated that a misinterpretation of DoD instruction, Medical Manpower and Personnel, June 30, 1997, 6000-13, para 6.6.3.1 and para 6.6.3.2 whereby, your ADSO of June 30, 2007, should actually read 30 June 2010.
>
> The review of your record indicates that you have a three-year obligation for Cardiology residency training, (1 July 2001—30 July 2004) and a 2 year obligation for your Interventional Cardiology fellowship training (1 July 2004—30 June 2005). Although you signed a training agreement obligating you until 30 June 2007, it is amended by this notification.

7

27.    Major Owens identified herself and a civilian representative of the PSB, Mr. Ledger Rash, as the points of contact for the matter.

28.    On or about March 13, 2006, petitioner spoke with Major Owens and Mr. Rash at the PSB. The conversation went as follows:[2]

| | |
|---|---|
| LTC Isenbarger: | Pardon me. I'm looking for Major Terry Owens or Mr. Rash. |
| MAJ Owens: | I'm sorry to keep you waiting, Colonel Isenbarger. I was wondering when you'd show up here. |
| LTC Isenbarger: | You were?  Why? |
| MAJ Owens: | Before you say anything, let me just say that I'm very sorry about this. I completely disagree with what they're doing to you, and it puts us in a difficult position when we have to deal face-to-face with the soldiers when they come in. |
| LTC Isenbarger: | You do?  What do you mean?  What exactly is being done? |

---

[2] Petitioner prepared this full account at the request of counsel.

MAJ Owens:          They are retroactively applying the new GME rules, even though you signed your HPSP contract prior to the change.    Your ADSO previously was correctly calculated according to the pre-1988 rules, because you signed your original HPSP contract in 1986.    Prior to your case, all GME ADSO's have been calculated according to pre-1988 rules when the HPSP contract was signed before the new rules went into effect in 1988. You are the only pre-1988 officer to have your ADSO retroactively recalculated using the new rules. When they asked us last year about the accuracy of your contract, we looked it over carefully and told them multiple times that the calculation was correct, but they kept trying to find a way to extend your obligation until they finally came up with this new change just recently.

LTC Isenbarger:     Is this Colonel Jaffin and Colonel Powers who are pushing this?

MAJ Owens:          Yes, it's their idea.

LTC Isenbarger:     Well, explain to me the difference in the pre-88 and post-88 rules as they apply to my GME contracts?

LTC Isenbarger:     Mr. Rash, can you come here please? This is Mr. Ledger Rash, who has been dealing with ADSO calculations for some time.

LTC Isenbarger:     How are you Mr. Rash? It's a pleasure.

Mr. Rash:           How are you doing, sir? Yes, according to the pre-88 rules, you incurred a two-year obligation for your three-year cardiology GME training at a military institution.   The obligation for your one-year interventional cardiology training at a civilian facility is one-year, paid back concurrently with the pre-existing two-year obligation, since you already owed that from the cardiology training.    The total obligation then

9

was correctly calculated originally as two years after your civilian training, and the completion date also correct at 30 June 2007. Under the post-88 rules, one would incur a half-year obligation per half-year of training in a military facility, for a total of three-years for the cardiology training, and another two-years in addition, for the one year of civilian interventional cardiology training, for a total of 5 years, which is the revised ADSO made by Colonel Powers. So there was no calculation error made previously, but rather a change in which rules were applied, which has never been done before. You are the only officer to whom this is being done. The other officers mentioned in Colonel Powers memo all had actual calculation errors that justified a correction, but the rules applied for the calculation were not changed as in your case.

LTC Isenbarger:    How can they do that, change the rules in the middle of the game? You can't selectively apply the rules differently to one officer. I signed the same HPSP contract that everybody else did back then. There is nothing unique about my contract. The rules should be applied the same to me as to everyone else of my era. There is 25 years of precedent here for pre-88 officers training obligations that are being completely ignored.

MAJ Owens:        You've got a strong case, and I think you've got an excellent chance of reversing this, but you need to appeal to the Army Board for Correction of Military Records to make that happen. I'd start with JAG and go from there.

LTC Isenbarger:    Well, thanks for your professionalism and integrity. I appreciate that. Can I have your card for future reference? Thanks and take care.

10

29.    The Johns Hopkins GME contract plainly states that petitioner's service obligation expires on June 30, 2007. The Army acknowledged (Ex. 5, at ¶ 2) that he "signed a training agreement obligating [him] until 30 June 2007," but completely disregarded it and purported to extend his obligation by three years.

30.    The Army never sought, much less obtained, his consent to modify the agreement.

31.    This unilateral action is also completely unsupported by consideration. It works entirely to the Army's benefit and petitioner's detriment.

32.    The fact that the Army is suffering from manpower and retention problems is not a valid basis to unilaterally alter ADSOs previously agreed to by the parties to a contract.

33.    The Army's claim (Ex. 5 at ¶ 1) that it had "misinterpreted" DoD Instruction 6000.13, "Medical Manpower and Personnel" (June 30, 1997) when it originally calculated petitioner's GME ADSO is false, misleading, and contrary to law.

34.    The Army did not misinterpret this post-1988 instruction. Instead, it attempted to retroactively apply the instruction, for the first time, to an officer who signed an HPSP contract before April 8, 1988. To their credit, Major Owens and Mr. Rash admitted as much.

35.    In any event, it is clear from the plain language of the GME contracts, the applicable directive and longstanding custom and practice that the Army's original ADSO calculations in petitioner's GME contracts are correct.

11

36.    The GME contracts are comprised of two documents: (1) the standard GME training agreement and (2) the "Adjusted Active Duty Service Obligation" memorandum. Both require the officer's signature to acknowledge acceptance of the contract and the resulting service obligation.

37.    The GME agreements at issue are template forms with fill-in-the-blanks for the different types of military and civilian based GME programs. Paragraph 7 of the agreements expressly provide that participation in GME training will result in an ADSO and explains that there are two sets of rules for calculating that obligation—*i.e.*, the pre-and post-April 8, 1988 rules. It makes clear that service obligations for officers like petitioner, who signed an HPSP contract before the April 8, 1988, are governed by the rules in effect before that date.

38.    The GME agreements, however, do not specify the adjusted service obligation or its expiration date. Exs. 3-4. Instead, the ADSO memorandum, which the Army prepares, fills this material gap by specifying the exact date on which the obligation would expire should the officer accept the training. In other words, the ADSO memorandum customizes this aspect of the agreement to the particular officer's situation. The memorandum is essential to the contract because it provides the otherwise unstated material term by which both parties measure their respective cost and benefit of the bargain. Without the ADSO memorandum, there would be no meeting of the minds.

39.    Because petitioner signed his HPSP contract in 1986, his GME service obligation should be—and in fact was—calculated under ¶ 7*a* and the 1981 version

of DoD Directive 6000.2. The applicable rules for calculating his ADSO are as follows:

    a.    For first term officers, time spent in DoD sponsored GME in a military facility does not increase the minimum term of service required. Ex. 1 at ¶ 5.

    b.    For non-obligated officers, time spent in DoD sponsored GME programs, both civilian and military based, result in additional service obligations. *Id.* at ¶¶ 5 & 14b. The service obligation for GME in a military and civilian facility, respectively, are calculated as follows:

        (1)    "Unless already obligated, a participant shall incur an ADO equal to the amount, up to 2 years total, such that the participant is obligated for a period of 2 years at the conclusion or termination of the GPE. *See* Directive 6000.2 (March 19, 1981) at Encl. 2, ¶ 3*a.*

        (2)    "A member subsidized by the Department of Defense during training in a civilian facility shall incur an ADO of 1 year for each such year of portion thereof. Unless already obligated, the minimum ADO that a participant shall incur for any period of GPE is equal to the amount, between 1 and 2 years total, such that the participant is obligated for a minimum period of 2 years at the conclusion or termination of said GPE. *Id.* at ¶ 3*b.*

40.    In accordance with those rules, petitioner incurred a two-year service obligation for his cardiology GME at WRAMC. While it was a three-year program, the directive's "up to 2 years total" clause imposes a two-year cap on his ADSO. *See* Directive 6000.2 (March 19, 1981) at Encl. 2, ¶ 3*a.*

41.    Petitioner incurred an additional one-year service obligation for his one-year GME at Johns Hopkins. Since he was "already obligated" to a two-year GME ADSO, the directive's "minimum period of 2 years" clause does not apply to

him. The Army's custom and practice—for those who entered HPSP contracts before April 8, 1988—has been to permit concurrent payback of these GME service obligations. This was confirmed by Mr. Rash on March 13, 2006. Running concurrently, petitioner's two GME ADSOs expire on June 30, 2007—two years after the date he completed his GME training.

42.    Therefore, the ADSO expiration date that appears in bold letters in petitioner's GME contract is the result of a correct application of ¶ 7*a* and the pre-1988 rules.

43.    Major Owens and Mr. Rash confirmed this.

44.    They further confirmed that, until this case, the Army had never applied the April 8, 1988 directive, or subsequent iterations, to calculate GME service obligations for officers who signed pre-1988 HPSP contracts.

45.    In any event, the Army cannot rely on a revised or new directive to alter ADSOs previously agreed to by the parties.

46.    The Army's effort to retroactively *and* selectively apply new GME rules to petitioner, despite his pre-1988 HPSP contract, is arbitrary and capricious, an abuse of discretion, and contrary to law.

47.    The Army is treating like cases differently without any rational basis or justification.

48.    It has also effectively changed pre-existing policy without a reasoned explanation for the change of course.

49.    For the past 25 years, the Army has applied ¶ 7a and the 1981 version
of DoD Directive 6000.2 to calculate GME obligations for officers who, like
petitioner, signed HPSP contracts before April 8, 1988. Indeed, shortly after the
1988 version of the directive was issued, the Army asked DoD whether it could
retroactively change the terms of a service agreement based on a revised directive.
Assistant General Counsel Robert L. Gilliat correctly concluded that it could not.
Ex. 6. In particular, he found that: (1) "a contract binding on the AFHPSP student
is also binding on the Military Department, the other party to the contract"; (2)
"[m]odification of the directive does not provide a sufficient legal basis to alter
active duty obligations previously agreed to by the parties to the contracts"; (3)
"service contracts would be meaningless if one party to them was free to alter
material terms"; and (4) a "directive change. . .should not be relied upon as a legal
basis to alter any active duty obligations which had been incorporated into the
AFHPSP contracts prior to the date of the change." *Id.* The Army correctly followed
this advice for the past two decades. Its sudden and unexplained departure from
this policy and practice is arbitrary and capricious.

50.    Major Owens and Mr. Rash confirmed that the Army consistently
applied the pre-1988 rules to officers who signed HPSP contracts during that era.
They further confirmed that the Army has never before applied the April 8, 1988
rules or subsequent iterations to calculate a GME ADSO for a pre-1988 HPSP
officer. Major Owens stated:

> Prior to [petitioner's] case, all GME ADSO's have been
> calculated according to pre-1988 rules when the HPSP contract

15

was signed before the new rules went into effect in 1988. . . [He is] the only pre-1988 officer to have [his] ADSO retroactively recalculated using the new rules.

51.     Similarly, Mr. Rash stated "there was no calculation error made previously, but rather a change in which rules were applied, which has never been done before." Petitioner is "the only officer to whom this is being done."

52.     There is no question that the Army can change its rules and issue new instructions, but it cannot retroactively apply such rules to change material terms of a pre-existing contract. That, however, is precisely what the Army has attempted here, but only with respect to petitioner. It has singled him out and treated him differently than all the other similarly situated pre-1988 HPSP contract holders.

53.     On May 3, 2006, petitioner objected to the Army's effort to modify his GME contract and thereby extend his ADSO from June 30, 2007 to June 30, 2010. He asked the Army to confirm that his ADSO expires on June 30, 2007, as his GME contract expressly provides. While he expressed his desire to avoid litigation, he explained that he would have no choice but to pursue judicial relief if he did not receive confirmation from the Army within ten business days from the date of his letter.

54.     On May 4, 2006, the Army confirmed receipt of his letter, but it has yet to respond to its substance.

### Cause of Action

55.     Petitioner realleges and incorporates by reference ¶¶ 1-54 above as if fully stated herein.

16

56.    A case of actual controversy within the jurisdiction of this Court exists as to whether petitioner's ADSO expires on June 30, 2007.

57.    The June 15, 2004 GME service agreement between the parties expressly provides that petitioner's ADSO expires on June 30, 2007. The Army's effort to modify this agreement and thereby extend his obligation is unlawful for at least three reasons: (a) it attempts modify a material term of a contract without mutual assent and consideration; (b) it is contrary to the plain language of the contracts and the applicable directive; and (c) it departs from longstanding policy and practice and treats similarly situated individuals differently, without a reasoned explanation for doing so.

Prayer

WHEREFORE petitioner respectfully requests that the Court—

(a)    direct respondent, in accordance with 28 U.S.C. § 2243, to show cause within the period prescribed by law why the writ should not be granted;

(b)    grant a writ of habeas corpus ordering respondent to discharge him on or before June 30, 2007 from the United States Army in accordance with his active duty service agreements; and

(c)    declare that his ADSO expires on June 30, 2007;

(d)    direct respondent to remove from petitioner's record all reference to the purported extension of his ADSO from June 30, 2007 to June 30, 2010;

17

(e)     award him costs and reasonable attorney fees in accordance with the Equal Access to Justice Act; and

(f)     grant such other and further relief as may, in the circumstances, be just and proper.

Respectfully submitted,

Eugene R. Fidell (112003)
Matthew S. Freedus (475887)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W.
Second Floor
Washington, D.C. 20036
(202) 466-8960

*Attorneys for Petitioner*

June 8, 2006

Certificate of Service

I declare under penalty of perjury that I have, this 8th day of June, 2006,
served the foregoing Application for Writ of Habeas Corpus by certified mail, return
receipt requested, to:

Hon. Kenneth L. Wainstein
United States Attorney for the District of Columbia
c/o Chief, Civil Division
Attn: Civil Process Clerk
555 4th Street, N.W.
Washington, DC 20001

Hon. Alberto R. Gonzales
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Major General Kenneth L. Farmer Jr.
Commander
Walter Reed Army Medical Center
6900 Georgia Avenue, N.W.
Washington, DC 20307


Matthew S. Freedus

With the Multi-National Force in Iraq )
                                       )    *ss.:*
                                       )

## Verification

    I declare under penalty of perjury under the law of the United States of America that I am the person for whose relief the foregoing Application for a Writ of Habeas Corpus is intended and that the facts set forth therein are true and correct. Executed on June 7, 2006.

Daniel W. Isenbarger